

**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
7500 Security Blvd.
Mail Stop: B1-01-31
Baltimore, MD 21244
410-786-2671

<u>**Via Electronic Delivery**</u>

James Ravindran
Quality Reimbursement Services, Inc.
150 N. Santa Anita Ave., Ste. 570A
Arcadia, CA 91006

    RE:   ***Notice of Dismissal***
          Case No. 24-0416GC, *et al.* (*see* **Appendix A** listing 13 cases)

Dear Mr. Ravindran:

The Provider Reimbursement Review Board ("Board") has reviewed the appeal requests filed by the Providers in the thirteen (13) above-referenced common issue related party ("CIRP") group and individual cases.  Set forth below is the decision of the Board to dismiss these 13 appeals challenging the Treatment of Part C Days from the Final Rule.

<u>**Background**</u>

Quality Reimbursement Services, Inc. ("QRS") represents a number of Providers in CIRP groups and individual cases which are challenging the Treatment of Part C Days as appealed from the Final Rule.  On December 6, 2023, QRS filed 13 appeal requests on behalf of different CIRP groups and individual providers concerning the final rule that the Secretary of Health and Human Services ("Secretary") published in the June 9, 2023 Federal Register ("June 2023 Final Rule") as it relates to the QRS Providers' yet-to-be-finalized FY 2007-2014 Medicare disproportionate share hospital ("DSH") reimbursement.[1]

In the June 2023 Final Rule, the Secretary adopted and finalized its policy to include Part C days in the SSI fraction as used in the DSH calculation for Part C discharges occurring prior to October 1, 2013 and applied this policy *retroactively* to certain open fiscal years to which this policy would appeal.

The Providers in these appeals all involve fiscal years ranging from 2007 to 2014.  The **sole** issue in each of these appeals is "whether Part C days are properly included in the denominator of the Medicare Fraction per a June 9, 2023, retroactive final rule issued by the Centers for Medicare & Medicaid Services ("CMS"), which is binding on the Medicare Administrative Contractor ("MAC"), or whether such final rule is illegal and cannot be enforced."[2]  The QRS Groups challenge the procedural and substantive validity of the policy adopted and finalized in the June 2023 Final Rule.[3]

---

[1] 88 Fed. Reg. 37772 (June 9, 2023).
[2] Issue Statement at 1 in Case No. 24-0416GC. Each of the Issue Statements in the 13 QRS appeals referenced in this decision are materially identical.
[3] 88 Fed. Reg. 37772 (June 9, 2023).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 2

Significantly, the Providers' appeal requests in these cases suggest that they may not have a right to appeal since "Certain of the referenced providers have this issue [being appealed here] pending in [another] appeal that was remanded to the MAC." Notwithstanding, they have not provided **_any_** explanation in their appeal requests of why the Board has jurisdiction over their appeal and *none has included **any** information on the other "pending . . . appeal that was remanded to the MAC," as **they allege** in their appeal requests*. As explained below, it is the Providers' responsibility under 42 C.F.R. § 405.1837(c) and Board Rules to include the necessary documentation in the appeal request to demonstrate the Board's jurisdiction over the appeals.

## Issue in Dispute

QRS is the group representative for these 13 cases filed on December 6, 2023. Each case has the same issue statement, which reads:

> The issue is whether Part C days are properly included in the denominator of the Medicare Fraction per a June 9, 2023, retroactive final rule issued by the Centers for Medicare & Medicaid Services (CMS), which is binding on the Medicare Administrative Contractor (MAC), or whether such final rule is illegal and cannot be enforced.

> The Provider appeals [Providers appeal] the Secretary's determination, which it calls a "final action," embodied in a [June 9, 2023] retroactive final rule, that requires Part C Days to be included in the Medicare Fraction of the disproportionate payment percentage for discharges occurring prior to October 1, 2013 ("the Part C Days Final Rule"). The Part C Days Final Rule became effective on August 8, 2023. The Provider challenges the procedural and substantive validity of the Part C Days Final Rule. Specifically, the Provider asserts [Providers assert] that the Part C Days Final Rule is procedurally invalid the retroactive nature of the rule violates the rulemaking provisions of the Social Security Act and the Administrative Procedure Act, and is contrary to the D.C. Circuit's opinion in *Northeast Hospital v. Sebelius*, and established precedent regarding the applicability of a pre-existing rule when a later rule is vacated (as was the 2004 final rule on Part C days). The Part C Days Final Rule is substantively invalid because it is arbitrary and capricious. Specifically, the Part C Days Final Rule is arbitrary and capricious because CMS did acknowledge that putting Part C Days in the Medicare Fraction was a departure from its policy or practice prior to the vacated 2004 rule. The Part C Days Final Rule also failed to account for hospitals' reliable interest on the pre-2004 final rule practice or policy, and also failed to recognize the enormous adverse financial impact on hospitals due to the change from the pre-2004 final rule practice or policy.

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 3

****

***Certain of the referenced providers have this issue pending in an appeal(s) that was remanded to the MAC.*** *However, any such remands preceded the Part C Days Final Rule and this appeal is limited to challenging the Part C Days final rule.* Moreover, it is not clear whether the Provider(s) will have full appeal rights following any decision upon remand. That is, it is not clear whether the Provider(s) will be afforded the opportunity to challenge the legality of the Part C Days Final rule if, for example: (a) there is no change in the Providers' Disproportionate Payment Percentage (DPP) in the MAC's determination following remand because Part C days were placed in the Medicare Fraction originally; or (b) there is a positive change in the Providers'] DPP for other reasons (such as the addition of Medicaid eligible days) but the DPP would have been even greater had Part C days not been included in the Medicare Fraction. For this reason, out of an abundance of caution the Provider(s) brings(bring) this challenge to the Part C Days Final Rule at this time.[4]

## Statutory and Regulatory Background:

### A. Medicare DSH Payment

Part A of the Medicare Act covers "inpatient hospital services." Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under the inpatient prospective payment system ("IPPS").[5] Under IPPS, Medicare pays predetermined, standardized amounts per discharge, subject to certain payment adjustments.[6]

The IPPS statute contains several provisions that adjust reimbursement based on hospital-specific factors.[7] This case involves the hospital-specific DSH adjustment, which requires the Secretary to provide increased IPPS payments to hospitals that serve a significantly disproportionate number of low-income patients.[8]

A hospital may qualify for a DSH adjustment based on its disproportionate patient percentage ("DPP").[9] As a proxy for utilization by low-income patients, the DPP determines a hospital's qualification as a DSH, and it also determines the amount of the DSH payment to a qualifying

---

[4] Issue Statement at 1,3 in Case No. 24-0416GC (emphasis added). Each of the Issue Statements in the 13 QRS appeals referenced in this decision are identical.
[5] *See* 42 U.S.C. § 1395ww(d)(l)-(5); 42 C.F.R. Part 412.
[6] *Id.*
[7] *See* 42 U.S.C. § 1395ww(d)(5).
[8] *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I); 42 C.F.R. § 412.106.
[9] *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(i)(I) and (d)(5)(F)(v); 42 C.F.R. § 412.l06(c)(l).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 4

hospital.[10]  The DPP is defined as the sum of two fractions expressed as percentages.[11]  Those two fractions are referred to as the "Medicare/SSI fraction" and the "Medicaid fraction."  Both of these fractions consider whether a patient was "entitled to benefits under part A."

The statute at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) defines the Medicare/SSI fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were ***entitled to benefits under part A*** of this subchapter and were entitled to supplemental security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were ***entitled to benefits under part A*** of this subchapter . . . .[12]

The Medicare/SSI fraction is computed annually by the Centers for Medicare and Medicaid Services ("CMS"), and the Medicare contractors use CMS' calculation to compute a hospital's DSH payment adjustment.[13]

The statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), defines the Medicaid fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX [the Medicaid program], but who were ***<u>not</u> entitled to benefits under part A of this subchapte***r, and the denominator of which is the total number of the hospital's patient days for such period.[14]

The Medicare contractor determines the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A and divides that number by the total number of patient days in the same period.[15]

### B.  Establishment of Medicare Part C and Treatment of Part C Days in the DSH Calculation

The Medicare program permits its beneficiaries to receive services from managed care entities. The managed care statute implementing payments to health maintenance organizations ("HMOs") and competitive medical plans ("CMPs") is found at 42 U.S.C. § 1395mm.  The

---

[10] *See* 42 U.S.C. §§ 1395ww(d)(5)(F)(iv) and (vii)-(xiii); 42 C.F.R. § 412.106(d).
[11] *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi).
[12] (Emphasis added.)
[13] 42 C.F.R. § 412.106(b)(2)-(3).
[14] (Emphasis added.)
[15] 42 C.F.R. § 412.106(b)(4).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 5

statute at 42 U.S.C. § 1395mm(a)(5) provides for "payment to the eligible organization under this section for individuals enrolled under this section with the organization and entitled to benefits under part A of this subchapter and enrolled under part B of this subchapter . . ." Inpatient hospital days for Medicare beneficiaries enrolled in HMOs and CMPs prior to 1999 are referred to as Medicare HMO patient care days.

In the September 4, 1990, Federal Register, the Secretary[16] stated that:

> Based on the language of section 1886(d)(5)(F)(vi) of the Act  [42 U.S.C. § 1395ww(d)(5)(F)(vi)], which states that the disproportionate share adjustment computation should include "patients who were entitled to benefits under Part  A," we believe it is appropriate to include the days associated with Medicare patients who receive care at a qualified HMO.  Prior to December 1, 1987, we were not able to isolate the days of care associated with Medicare patients in HMOs, and therefore, were unable to fold this number into the calculation [of the DSH adjustment].  However, as of December 1, 1987, a field was included on the Medicare Provider Analysis and Review (MEDPAR) file that allows us to isolate those HMO days that were associated with Medicare patients.  Therefore, since that time we have been including HMO days in the SSI/Medicare percentage [of the DSH adjustment].[17]

At that time Medicare Part A paid for HMO services and patients continued to be eligible for Part A.[18]

With the creation of Medicare Part C in 1997,[19] Medicare beneficiaries who opted for managed care coverage under Medicare Part C were no longer entitled to have payment made for their care under Part A.  Consistent with the statutory change, CMS did not include Medicare Part C days in the SSI ratios used by the Medicare contractors to calculate DSH payments for the fiscal years 2001-2004.[20]

---

[16] of Health and Human Services.
[17] 55 Fed. Reg. 35990, 39994 (Sept. 4, 1990).
[18] *Id.*
[19] The Medicare Part C program did not begin operating until January 1, 1999.  *See*  P.L. 105-33, 1997 HR 2015*, codified as* 42 U.S.C. § 1394w-21 Note (c) "Enrollment Transition Rule - An individual who is enrolled [in Medicare] on December 31 1998, with an eligible organization under . . . [42 U.S.C. 1395mm] shall be considered to be enrolled with that organization on January 1, 1999, under part C of Title XVIII . . . if that organization as a contract under that part for providing services on January 1, 1999 . . . ."  This was also known as Medicare+Choice. The Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Pub.L. 108-173), enacted on December 8, 2003, replaced the Medicare+Choice program with the new Medicare Advantage program under Part C of Title XVIII.
[20] 69 Fed. Reg. 48918, 49099 (Aug. 11, 2004).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 6

No further guidance regarding the treatment of Part C days in the DSH calculation was provided until the 2004 Inpatient Prospective Payment System ("IPPS") proposed rules were published in the Federal Register.  In that notice the Secretary stated that:

> . . . once a beneficiary has elected to join an M+C plan, that beneficiary's benefits are no longer administered under Part A *. . . . once a beneficiary elects Medicare Part C, those patient days attributable to the beneficiary should not be included in the Medicare fraction of the DSH patient percentage.  These patient days should be included in the count of total patient days in the Medicaid  fraction (the denominator), and the patient's days for the M+C beneficiary who is also eligible for Medicaid would be included in the numerator of the Medicaid fraction . . . .*[21]

The Secretary purportedly changed her position in the Federal fiscal year ("FFY") 2005 IPPS final rule, by noting she was "revising our regulations at [42 C.F.R.] § 412.106(b)(2)(i) to include the days associated with [Part C] beneficiaries in the Medicare fraction of the DSH calculation."[22]  In response to a comment regarding this change, the Secretary explained that:

> . . . *We do agree that once Medicare beneficiaries elect Medicare Part C coverage, they are still, in some sense, entitled to benefits under Medicare Part A*.  *We agree with the commenter that these days should be included in the Medicare fraction of the DSH calculation.  Therefore, we are not adopting as final our proposal stated in the May 19, 2003 proposed rule to include the days associated with M+C beneficiaries in the Medicaid fraction.  Instead, we are adopting a policy to include the patient days for M+C beneficiaries in the Medicare fraction . . . . if the beneficiary is also an SSI recipient, the patient days will be included in the numerator of the Medicare fraction.  We are revising our regulations at § 412.106(b)(2)(i) to include the days associated with M+C beneficiaries in the Medicare fraction of the DSH calculation.*[23]

This statement would require inclusion of Medicare Part C inpatient days in the Medicare fraction of the DSH calculation.

Although the change in DSH policy regarding 42 C.F.R. § 412.106(b)(2)(i) was included in the August 11, 2004, Federal Register, no change to the regulatory language was published until August 22, 2007, when the FFY 2008 IPPS final rule was issued.[24]  In that publication the Secretary noted that no regulatory change had in fact occurred, and announced that she had made "technical

---

[21] 68 Fed. Reg. 27154, 27208 (May 19, 2003) (emphasis added).
[22] 69 Fed. Reg. at 49099.
[23] *Id.* (emphasis added).
[24] 72 Fed. Reg. 47130, 47384 (Aug. 22, 2007).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 7

corrections" to the regulatory language consistent with the change adopted in the FFY 2005 IPPS final rule.   These "technical corrections" are reflected at 42 C.F.R. §§ 412.106(b)(2)(i)(B) and (b)(2)(iii)(B).[25]  As a result of these rulemakings, Part C days were required to be included in the Medicare fraction as of October 1, 2004 (the "Part C DSH policy").  Subsequently, as part of the FFY 2011 IPPS final rule published on August 15, 2010, the Secretary made a minor revision to §§ 412.106(b)(2)(i)(B) and (b)(2)(iii)(B) "to clarify" the Part C DSH policy by replacing the word "or" with "including."[26]

There has been substantial litigation over whether enrollees in Part C plans are "entitled to benefits" under Medicare Part A when determining their placement in either the DSH Medicare or Medicaid fraction.

First, in 2011, the D.C. Circuit held that the Secretary's Part C policy in the FY 2005 IPPS Final Rule could not be applied retroactively for fiscal years 1999 through 2002, but did not address whether it could be applied to later years or whether the interpretation was reasonable.[27] In 2014, the U.S. Circuit Court for the District of Columbia in *Allina Healthcare Services v. Sebelius* ("*Allina I*"),[28] vacated both the FFY 2005 IPPS final rule adopting the Part C DSH policy and the subsequent regulations issued in the FFY 2008 IPPS final rule codifying the Part C DSH policy adopted in FFY 2005 IPPS rule.[29]  In vacating the final rule, it reasoned that this deprived the public of adequate opportunity for notice and comment before the final rule was promulgated in 2004.[30]  However, the Secretary has not acquiesced to that decision.

In 2013, the Secretary promulgated a new rule that would include Part C days in the Medicare fraction for fiscal years 2014 and beyond.[31]  However, at that point, no new rule had been adopted for fiscal years 2004-2013 following the D.C. Circuit's decision in *Allina I* to vacate the 2004 rule.  In 2014 the Secretary published Medicare fractions for fiscal year 2012 which included Part C days.[32]  A number of hospitals appealed this action. In *Azar v. Allina Health Services* ("*Allina II*"),[33] the Supreme Court held that the Secretary did not undertake appropriate notice-and-comment rulemaking when it applied its policy to fiscal year 2012, despite having no

---

[25] *Id*. at 47411.

[26] 75 Fed. Reg. 50042, 50285-50286, 50414 (Aug. 16, 2010).  *See also* 75 Fed. Reg. 23852, 24006-24007 (May 4, 2010) (preamble to proposed rulemaking stating: "We are aware that there might be some confusion about our policy to include MA days in the SSI fraction. . . . In order to further clarify our policy that patient days associated with MA beneficiaries are to be included in the SSI fraction because they are still entitled to benefits under Medicare Part A, we are proposing to replace the word 'or' with the word 'including' in § 412.106(b)(2)(i)(B) and § 412.106(b)(2)(iii)(B)."); *Allina Healthcare Servs. v. Sebelius*, 904 F. Supp. 2d 75, 82 n.5, 95 (2012), *aff'd in part and rev'd in part*, 746 F. 3d 1102 (D.C. Cir. 2014).

[27] *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 17 (D.C. Cir. 2011).

[28] 746 F. 3d 1102 (D.C. Cir. 2014).

[29] *Id*. at 1106 n.3, 1111 (affirming portion of the district court decision vacating the FFY 2005 IPPS rule).  *See also Allina Health Servs. v. Sebelius*, 904 F. Supp. 2d 75, 89 (D.D.C. 2012) ("The Court concludes that the Secretary's interpretation of the fractions in the DSH calculation, announced in 2004 and not added to the Code of Federal Regulations until the summer of 2007, was not a "logical outgrowth" of the 2003 NPRM.").

[30] *Id.* at 2011.

[31] 78 Fed. Reg. 50496, 50614 (Aug. 19, 2013).

[32] *See Allina Health Services v. Price*, 863 F.3d 937, 939-940 (D.C. Cir. 2017).

[33] 139 S. Ct. 1804 (2019).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 8

formal rule in place.[34]  There was no rule to vacate in this instance, and the Supreme Court merely affirmed the D.C. Circuit's decision to remand the case "for proceedings consistent with [its] opinion."[35]  The Supreme Court did not reach the question of whether the policy to count Part C days in the Medicare fraction was impermissible or unreasonable.[36]

On August 6, 2020, the Secretary published a notice of proposed rulemaking to adopt a policy to include Part C days in the Medicare fraction for fiscal years prior to 2013.[37]  On August 17, 2020, CMS issued CMS Ruling 1739-R stating that, as "CMS has announced its intention to conduct the rulemaking required by the Supreme Court's decision in Allina [II]":

> This Ruling provides notice that the Provider Reimbursement Review Board (PRRB) and other Medicare administrative appeals tribunals lack jurisdiction over certain provider appeals regarding the treatment of patient days associated with patients enrolled in Medicare Advantage plans in the Medicare and Medicaid fractions of the disproportionate patient percentage; this ruling applies only to appeals regarding patient days with discharge dates before October 1, 2013 that arise from Notices of Program Reimbursement (NPRs) that are issued before CMS issues a new final rule to govern the treatment of patient days with discharge dates before October 1, 2013 or that arise from an appeal based on an untimely NPR under 42 U.S.C. 1395oo(a)(1)(B) or (C) and any subsequently issued NPR for that fiscal year pre-dates the new final rule.[38]

The Secretary did not change the proposed rule and issued it in final on June 9, 2023.[39]  The June 2023 Final Rule provides the following guidance on the extent to which it is to be applied *retroactively*:

> [T]he Secretary has determined that it is in the public interest for CMS to adopt a retroactive policy for the treatment of MA patient days in the Medicare and Medicaid fractions through notice and comment rulemaking for discharges before October 1, 2013 (the effective date of the FY 2014 IPPS final rule). CMS must calculate DSH payments for periods that include discharges occurring before the effective date of the prospective FY 2014 IPPS final rule for hundreds of hospitals whose DSH payments **for those periods are still open or have not yet been finally settled**, encompassing thousands of cost reports.[40]

---

[34] *Id.* at 1817.
[35] *Id.*; *Allina Health Services v. Price*, 863 F.3d at 945.
[36] 139 S. Ct at 1814.
[37] 85 Fed. Reg. 47723 (Aug. 6, 2020).
[38] CMS Ruling 1739-R at 1-2.
[39] 88 Fed. Reg. 37772 (June 9, 2023).
[40] *Id.* at 37775 (emphasis added).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 9

Further, the June 2023 Final Rule provided the following clarification on the intent and purpose of CMS Ruling 1739-R:

> The Ruling was not intended to cut off appeal rights and will not operate to do so. It was intended to promote judicial economy by announcing HHS's response to the Supreme Court's decision in *Allina II*. After the Supreme Court made clear that CMS could not resolve the avowedly gap-filling issue of whether Part C enrollees are or are not "entitled to benefits under part A" for years before FY 2014 without rulemaking, HHS issued the Ruling [1739-R] so that providers would not need to continue litigating over DPP fractions that were issued in the absence of a valid rule. In other words, the point of the Ruling was to avoid wasting judicial, provider, and agency resources on cases in which the Secretary agreed that, after the Supreme Court's decision in *Allina II*, he could not defend such appeals of fractions issued in the absence of a valid regulation.[41]

**Decision of the Board:**

As set forth below, the Board hereby ***dismisses*** the Providers' appeals because they failed to appeal from a final determination, their appeals are premature, and their appeal requests failed to meet the content requirements for a request for Board hearing.

***A.   The Part C Policy finalized in the June 2023 Final Rule Is Not an Appealable "Final Determination" under 42 U.S.C. § 1395oo(a)(1)(A)(ii).***

In their appeal requests, the Providers allege (without providing any proof) "certain of the referenced providers have this issue pending in an appeal(s) that was remanded to the MAC." The Providers state out of an abundance of caution they have brought this appeal as they are unsure about their appeal rights for these cases *allegedly* pending on remand:

> [I]t is not clear whether the Provider(s) will have full appeal rights following any decision upon remand. That is, it is not clear whether the Provider(s) will be afforded the opportunity to challenge the legality of the Part C Days Final rule if, for example: (a) there is no change in the Providers' Disproportionate Payment Percentage (DPP) in the MAC's determination following remand because Part C days were placed in the Medicare Fraction originally; or (b) there is a positive change in the Providers' DPP for other reasons (such as the addition of Medicaid eligible days) but the DPP would have been even greater had Part C days not been included in the Medicare Fraction. For this reason, out of an

---

[41] 88 Fed. Reg. at 37788 (emphasis in original).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 10

> abundance of caution the Provider(s) brings (bring) this challenge
> to the Part C Days Final Rule at this time.[42]

Notwithstanding the fact that these *other* alleged appeals are still *pending* and involve the *same* issue and fiscal years, the Providers filed appeal requests to establish the instant 13 appeals set forth in <u>**Appendix A**</u> based on their appeal of the finalization of the policy at issue in the June 2023 Final Rule. In filing these appeals, the Providers identified the June 2023 Final Rule as the "final determination" being appealed. As this is a final rule (as opposed to an NPR or revised NPR), they appear to be asserting that their right to appeal is based on 42 U.S.C. § 1395oo(a)(1)(A)(ii). In this regard, § 1395oo(a) states the following in pertinent part:

> **(a)  Establishment**
>
> . . . *[A]ny hospital* which receives payments in amounts computed under subsection (b) or (d) of section 1395ww of this title *and <u>which has submitted such [cost] reports</u> within such time as the Secretary may require <u>in order to make payment under such section</u>* may obtain a hearing with respect to such payment by the Board, if—
>
> (1) such provider—
>
> (A) . . .
>
> (ii) is dissatisfied with a final determination of the Secretary *as to the amount of the payment* under subsection (b) or (d) of section 1395ww of this title, . . . .[43]

However, the Board finds that the adoption/finalization of this policy in the June 2023 Final Rule is not a "final determination" directly appealable to the Board *for purposes of 42 U.S.C. § 1395oo(a)(1)(A)(ii)*. Rather, the providers' appeals are premature as described below.

Unlike DRG rates and other adjustments such as the wage index, a hospital's eligibility for a DSH payment (and, if eligible, the amount of that payment) during a particular fiscal year is not ***prospectively*** set or determined as part of the relevant IPPS final rule. In this regard, 42 U.S.C. § 1395ww(d)(5)(F) refers to the DSH adjustment being calculated "with respect to a [hospital's] cost reporting period" and uses days associated with inpatients stays *occurring during that cost reporting period*.[44] To this end, DSH eligibility ***and*** payment, if any, is determined, calculated, and finalized *annually* through the cost report audit/settlement process as made clear in 42

---

[42] Providers' Issue Statements.

[43] (Bold emphasis in original and italics and underline emphasis added.)

[44] The Board notes that the Medicare DSH adjustment provision under 42 U.S.C. § 1395ww(d)(5)(F) was enacted by § 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and became effective for discharges occurring on or after May 1, 1986. Pub. L. 99-272, § 9105, 100 Stat. 82, 158-60. As such, it was enacted several years after the initial legislation that established the IPPS.

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 11


C.F.R. § 412.106(i) which sets forth the following instructions regarding the determination of a hospital's eligibility for a DSH payment for each fiscal year and, if so, how much:

> (i) *Manner and timing of [DSH] payments*. (1) **Interim** [DSH] **payments** are made **during the payment year to each hospital that is <u>estimated</u> to be eligible** for payments under this section at the time of the annual final rule for the hospital inpatient prospective payment system, **subject to the <u>final</u> determination of eligibility <u>at the time of cost report settlement</u> for each hospital**.

> (2) **<u>Final</u> payment determinations are made <u>at the time of cost report settlement</u>**, based on the **<u>final</u>** determination of each hospital's eligibility for payment under this section.[45]

The Secretary makes clear that this regulation is based on "our ***longstanding* process** of making ***interim* eligibility** determinations for Medicare DSH payments *with **final** determination **at cost report settlement***."[46]  Examples of other adjustments to IPPS payment rates that are based, in

---

[45] (Italics emphasis in original and bold and underline emphasis added.)  This section was added as part of the FY 2014 IPPS Final Rule.  78 Fed. Reg. 50496, 50646, (Aug. 19, 2013).  It was initially codified at § 412.106(h) (*id.*), but was later redesignated as § 412.106(i) (87 Fed. Reg. 48780, 49049 (Aug. 10, 2022)).

[46] 78 Fed. Reg. at 50627.  *See also* Provider Reimbursement Manual, CMS Pub. 15-1 ("PRM 15-1"), § 2807.2(B)(5) (last revised Aug. 1993, Transmittal 371) (stating: "*At **final** settlement of the cost report*, the intermediary determines the final disproportionate share adjustment based on the actual bed size and disproportionate share patient percentage for the cost reporting period." (emphasis added)).  In the preamble to the FY 2014 IPPS Final Rule, the Secretary discussed the DSH eligibility and payment process and the following are excerpts from that discussion:

> *Comment*: Several commenters requested that CMS undertake additional audits to verify the data used to compute the 25-percent empirically justified Medicare DSH payment adjustments. Other commenters requested that CMS grant additional time for hospitals to verify the data and adjust their cost reports to ensure that the data used to compute the adjustment are accurate and up to date. Some commenters requested that CMS establish procedures to allow a hospital initially determined not to be eligible for Medicare DSH payments to begin receiving empirically justified Medicare DSH payments if data become available that indicate that the hospital would be eligible.

> *Response*: As we have emphasized, we are maintaining the well-established methodology and payment processes used under the current Medicare DSH payment adjustment methodology for purposes of making the empirically justified Medicare DSH payment adjustments. Hospitals are quite familiar with the cost reporting requirements and auditing procedures employed under the current Medicare DSH payment adjustment methodology. Hospitals are also familiar with the current process of determining **interim eligibility** for Medicare DSH payments **with final determination** at cost report settlement. Therefore, we do not believe that it would be warranted to add additional complexity to these procedures by adopting any of these recommendations.

> ****

> **For the reasons discussed above regarding the empirically justified Medicare DSH payments** [*i.e.*, the DSH payment calculation made under 42 U.S.C. § 1395ww(d)(5)(F)], **we do not believe that it is necessary or advisable to depart from our longstanding process of making <u>interim eligibility</u> determinations for Medicare DSH payments with <u>final determination</u> at cost report settlement.**  As we discuss in greater detail in section V.E.3.f. of the preamble to this final rule, we will make interim eligibility determinations based on data from the most recently available SSI ratios and Medicaid fractions prior to the beginning of the payment year.  We will then make final determinations of eligibility at the time of settlement of each hospital's cost report. Therefore, we

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 12

whole or in part, on certain data/costs claimed on the as-filed cost report and then determined and reimbursed through the cost report audit and settlement process include bad debts,[47] direct graduate medical education ("GME"),[48] and indirect GME.[49]

Here, none of the Providers' appeal requests included a copy of the NPR or revised NPR (with associated audit adjustment pages) for the year at issue that would underlie the alleged pending remand to the MACs. As a result, it is unclear whether that those NPRs/revised NPRs addressed consistent with 42 C.F.R. § 412.106(i) both: (1) whether each of these Providers is eligible for a DSH payment *for the relevant year at issue*; and (2) if so, how much.[50] Further, as discussed *infra*, each of these Providers have alleged that it has pending before the MAC another appeal of the same Part C days issue; however, it is unclear why the Providers were remanded as alleged (*e.g.*, remanded pursuant to a Court Order vs. remanded pursuant to CMS Ruling 1498-R) and what the parameters of those remands is.

Regardless, the four corners of the June 2023 Final Rule confirms that the Providers appeals are premature because the June 2023 Final Rule confirms both that: (1) it is *not* a final determination appealable to the Board; *and* (2) the Secretary did *not* otherwise intend for it to be a final determination appealable to the Board. The June 2023 Final Rule simply finalizes the adoption of the Part C days policy at issue for open and prospective cost reporting periods relating to

---

proposed that, at cost report settlement, the fiscal intermediary/MAC will issue a notice of program reimbursement that includes a determination concerning whether each hospital is eligible for empirically justified Medicare DSH payments and, therefore, eligible for uncompensated care payments in FY 2014 and each subsequent year. In the case where a hospital received interim payments for its empirically justified Medicare DSH payments and uncompensated care payments for FY 2014 or a subsequent year on the basis of estimates prior to the payment year, but is determined to be ineligible for the empirically justified Medicare DSH payment at cost report settlement, the hospital would no longer be eligible for either payment and CMS would recoup those monies. For a hospital that did not receive interim payments for its empirically justified Medicare DSH payments and uncompensated care payments for FY 2014 or a subsequent year, but at cost report settlement is determined to be eligible for DSH payments, the uncompensated care payment for such a hospital is calculated based on the Factor 3 value determined prospectively for that fiscal year.

*Id.* at 50626-27 (emphasis added).

[47] 42 C.F.R. §§ 412.2(f)(4), 412.115(a) (stating: "An additional payment is made to each hospital in accordance with § 413.89 of this chapter for bad debts attributable to deductible and coinsurance amounts related to covered services received by beneficiaries.).

[48] 42 C.F.R. § 412.2(f)(7) (stating that hospitals receive an additional payment for "[t]he direct graduate medical education costs for approved residency programs in medicine, osteopathy, dentistry, and podiatry as described in §§413.75–413.83 of this chapter.").

[49] 42 C.F.R. §§ 412.2(f)(2), 412.105. *See also* PRM 15-1 § 2807.2(B)(6) (stating: "*At **final settlement** of the cost report*, the intermediary determines the indirect teaching adjustment based on the actual number of full time equivalent residents and average daily census for the cost reporting period. (emphasis added)).

[50] In this regard, a provider that did not qualify for a DSH payment adjustment for a particular fiscal year may appeal that finding by challenging multiple components of the DSH adjustment calculation which, if successful, could result in the provider qualifying for a DSH adjustment for that year. Further, the fact that a hospital has received a DSH payment in a *prior* fiscal year, does not mean or guarantee that the hospital will (or continue to) be eligible for and receive a DSH payment in a subsequent fiscal year. For each fiscal year, the Medicare contractor determines whether a hospital is eligible for a DSH payment and, if so, how much based on multiple variables associated with that fiscal year (*e.g.*, the number of Medicaid eligible days in the relevant fiscal year).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 13

discharges occurring prior to October 1, 2013.  It does not make any determination on *any* hospital's DSH eligibility (much less these Providers') and, if so, how much.  Moreover, it does not publish *any* hospital's SSI percentage (much less these Providers for the relevant years at issue) that would be used in DSH calculations for those hospitals whose eligibility would later be determined as part of their cost report settlement process for the relevant fiscal years.  Further, the following excerpts from the June 2023 Final Rule discussing a hospital's right to challenge the Part C days policy adopted therein make clear that the Secretary did not consider the final rule to be an appealable "final determination":

1. "Additionally, the Secretary has determined that it is in the public interest for CMS to adopt a retroactive policy for the treatment of MA patient days in the Medicare and Medicaid fractions through notice and comment rulemaking for discharges before October 1, 2013 (the effective date of the FY 2014 IPPS final rule). *CMS must calculate DSH payments for periods that include discharges occurring before the effective date of the prospective FY 2014 IPPS final rule for hundreds of hospitals **whose DSH payments for those periods are still open or have <u>not</u> yet been <u>finally settled</u>, encompassing thousands of cost reports**.  In order to calculate these payments, CMS **must** establish Medicare fractions for <u>each</u> applicable cost reporting period* during the time period for which there is currently no regulation in place that expressly addresses the treatment of Part C days."[51]

2. "We do not agree that it is arbitrary or capricious to treat hospitals' Part C days differently on the basis of the timing of their appeals vis-a-vis Supreme Court and lower court decisions. The instructions to contractors that issued after the *Northeast* decision cannot control over the holding of the Supreme Court in *Allina II*.  It is also not unusual for cost reports to be finalized differently from one another with respect to a legal issue depending on the outcome of litigation raising that issue and the status of a hospital's appeal at the time of a final non-appealable decision.  Providers will also be able to request to have their Medicare fraction realigned to be based on their individual cost reporting periods rather than the Federal fiscal year, in accordance with the normal rules. **Providers who remain dissatisfied <u>after receiving NPRs and revised NPRs</u> that reflect the interpretation adopted in this final action <u>retain appeals rights</u> and <u>can challenge</u> the reasonableness of the Secretary's interpretation set forth in <u>this final action</u>**."[52]

3. "Providers who have pending appeals reflecting fractions calculated in the absence of a valid rule will receive NPRs or revised NPRs reflecting DSH fractions calculated pursuant to this new final action and *will have appeal rights with respect to the treatment of Part C days in the calculation of the DSH fractions **contained in the NPRs or revised NPRs**. Providers whose appeals of the Part C days issue have been remanded to the Secretary will likewise receive NPRs or revised NPRs* reflecting fractions calculated pursuant to this new final action, *with attendant appeal rights*.  Because NPRs and revised NPRs will reflect the application of a new DSH Part C days rule, CMS will have taken action under the new

---

[51] 88 Fed. Reg. at 37774-75 (emphasis added).
[52] *Id.* at 37787 (underline and bold emphasis added and italics emphasis in original).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 14

action, and *the new or revised NPRs will provide hospitals with a vehicle to appeal the new final action even if the Medicare fraction or DSH payment does not change numerically.*"[53]

4. "*When the Secretary's treatment of Part C days in this final action is reflected in NPRs and revised NPRs, providers*, including providers whose appeals were remanded under the [CMS Ruling [1739-R], *will be able to challenge the agency's interpretation by appealing those NPRs and revised NPRs*. While some providers have already received reopening notices and had their NPRs held open for resolution of the Part C days issue, the issuance of new NPRs and revised NPRs pursuant to remands under the Ruling are not reopenings."[54]

The above discussion in the preamble to the June 2023 Final Rule makes clear that hospitals would be *not* able to *directly* appeal from Final Rule since the finalized policy is not applied in the Final Rule to any specific hospitals and the preamble's discussion of a hospital's right to challenge that finalized policy is only in the context of the yet-to-be issued NPRs (original or revised) that: (1) would be issued *following publication of the new SSI percentages*; and (2) would both apply the finalized policy and would be sued to determine DSH eligibility for a hospital's prior pre-October 1, 2013 cost reporting period that is still open for resolution (whether through issuance of an original or revised NPR[55]) and, if so, the amount of the DSH payment. Here, if the June 2023 Final Rule will be applied to them for the fiscal years at issue, then it is clear that Providers' appeals are premature as they will have an opportunity to later file an appeal to challenge the policy at issue once their respective fiscal year NPRs/revised NPRs are issued *consistent with the above excerpts from the preamble to the June 2023 Final Rule and 42 C.F.R. § 412.106(i).*

The Board recognizes that the Part C issue has a long litigation history and the most recent is referred to as the *Allina II* litigation.[56]  However, the *Allina II* litigation has no relevance to the **jurisdictional** issue that the Board is addressing in the instant case because that litigation did *not* address the Board's *jurisdiction* over the underlying appeals of the nine (9) Plaintiff hospitals in *Allina II* (*i.e.*, it does not address whether the publication of the SSI ratios was a "final determination" *for purposes of 42 U.S.C. § 1395oo(a)(1)(A)(ii)*).[57]

---

[53] *Id.* at 37788 (emphasis added).

[54] *Id.* (emphasis added).

[55] Just because a hospital was eligible for a DSH payment in the original NPR, does not mean that the hospital would *continue* to be eligible for a DSH payment following the issuance of a revised NPR pursuant to the June 9,2023 Final Rule. Similarly, the converse may be true. As such, a hospital eligibility status may change following the issuance of a revised NPR pursuant to the June 9, 2023 Final Rule. Moreover, there could be other DSH variables at play in the NPR/revised NPR such as consideration of Medicaid eligible days (removal or addition of such days) depending on what other issues may remain open in the relevant fiscal year.

[56] *Allina II* began as *Allina Health Servs. v. Burwell*, No. 14-01415, (D.D.C. Aug. 19, 2014) resulting in *Allina Health Servs. v. Burwell*, 201 F. Supp. 3d 94 (D.D.C. 2016), *reversed Allina Health Servs. v. Price*, 863 F.3d 937 (D.C. Cir. 2017), *aff'd sub nom. Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019) ("*Allina II*").

[57] Rather, *Allina II* addresses the Board's "no-authority determination" when it granted EJR for the *Alliana II* providers. This is not a *jurisdictional* issue under 42 U.S.C. § 1395oo(a)(1), but rather an issue relating to whether the Board appropriately granted EJR pursuant to 42 U.S.C. § 1395oo(f)(1). Further, the Board takes administrative notice that, in the Complaint filed to establish the *Allina II* litigation, **none** of the 9 Plaintiff hospitals based their right to appeal on the publication of the SSI fractions pursuant to 42 U.S.C. § 1395oo**(a)(1)(A)(ii)**. Rather, the

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 15

Similarly, the Board declines to follow D.C. District Court's decision in *Battle Creek*[58] and instead continues to find the D.C. District Court's 2022 decision in *Memorial Hospital* to be instructive. *Memorial Hospital* concerns another variable used in the DSH adjustment calculation. Specifically, the providers in that case appealed ***the publication of their DSH SSI ratios*** (which is one step *after* the cases at hand where Providers are appealing the final rule adopting/finalizing a policy ***prior to*** the publication of the DSH SSI ratios reflecting that Final Rule[59]).  The providers in *Memorial Hospital* argued that there are certain instances where a provider can appeal prior to receiving an NPR and gave citations to certain D.C. Circuit cases in support.  However, the D.C. District Court distinguished this case because "the secretarial determination at issue was either the only determination on which payment depended or clearly promulgated as a final rule."[60]  The D.C. District Court ultimately agreed with the Board that this was not an appealable final determination.  In its discussion, the D.C. District Court agreed with the Secretary that the publication of the SSI ratios, *even if the publication of the SSI fractions had been issued as "final,"* it could and would not be a final determination "as to the amount of payment" because the SSI fractions are "just one of the variables that determines whether hospitals receive a DSH payment ***and***, *if so*, *for how much*."[61]  The D.C. District Court concluded:

> A challenge to *an **element** of payment* under 42 U.S.C.
> § 1395oo(a)(1)(A)(ii) is ***only*** *appropriate **if***, as the D.C. Circuit has

---

[58] Complaint makes clear that each of the 9 Plaintiff hospitals based their right to appeal *on the failure of the Medicare Contractor to timely issue an NPR as set forth in 42 U.S.C. § 1395oo(a)(1)(B)* as implemented at 42 C.F.R. § 405.1835(c) (2014). *Allina Health Servs. v. Burwell*, No. 14-01415, Complaint at ¶¶ 38-39 (D.D.C. Aug. 19, 2014) (stating: 38. . . . None of the [9] plaintiff Hospitals has received an NPR reflecting final Medicare DSH payment determinations for their cost reporting periods beginning in federal fiscal years 2012. 39. As a result, *the [9] plaintiff Hospitals timely filed appeals to the Board, **pursuant to 42 U.S.C. §§ 1395oo(a)(1)(B)**, to challenge the agency's treatment of Medicare part C days as Medicare part A days for purposes of the part A/SSI fraction and the Medicaid fraction of the Medicare DSH calculation for their 2012 cost years."* (footnote omitted and emphasis added)).

[58] The Board recognizes that, in *Battle Creek*, the D.C. District Court addressed a jurisdictional issue involving DSH SSI fractions ***similar to*** the jurisdictional issue that the *same* Court (different judge) issued in *Memorial Hospital* but reached a different conclusion.  However, the Board disagrees with the *Battle Creek* decision and maintains that *Memorial Hospital* is a better-reasoned decision and, in particular, provides a more thoughtful analysis and application of the D.C. Circuit's decision in *Washington Hospital*.  Indeed, the *Battle Creek* decision does not even discuss (much less reference) the *Memorial Hospital* decision that was issued 19 months earlier by a different judge in the ***same*** Court.  Finally, *Battle Creek* is distinguishable from the cases at hand.  *Battle Creek* addressed whether the publication of SSI fractions is a final determination.  In contrast, the Providers did not appeal the publication of SSI fractions but rather a final rule adopting and finalizing the policy at issue ***prior to*** the issuance of new SSI fractions to be used in the yet-to-be issued NPRs/revised NPRs for the hospital covered by the terms of that final rule.  To this end, in finalizing that policy adoption in the June 2023 Final Rule, the Secretary announced that "CMS must calculate DSH payments for periods that include discharges occurring before the effective date of the prospective FY 2014 IPPS final rule for hundreds of hospitals whose DSH payments *for those periods are still open or have not yet been finally settled* . . . ." 88 Fed. Reg. at 37774 (emphasis added).

[59] The Providers' appeal requests are clear that they were filed to appeal from the June 2023 Final Rule, as opposed to appeal from any publication of SSI fractions. Indeed, it is not clear from the record before the Board whether any new SSI percentages for these Providers *for the specific fiscal years appealed* have been in fact issued *pursuant to the implementation of the June 2023 Final Rule as set forth therein*. To this end, the Board notes that 42 C.F.R. § 405.1837(c)(3) requires an appeal request to include a copy of the final determination being appealed, but none of the appeal request include a copy of the publication of any SSI fractions.

[60] 2022 WL 888190 at *8.

[61] *Id.* at *9 (emphasis added).

> explained, "*the Secretary ha[s] firmly established 'the only*
> *variable factor* in the final determination as to the amount of
> payment under § 1395ww(d).'" *Monmouth Med. Ctr. v. Thompson*,
> 257 F.3d 807, 811 (D.C. Cir. 2001) (quoting *Washington Hosp. Ctr.*
> *v. Bowen*, 795 F.2d 139, 147 (D.C. Cir. 1986)) (emphasis added);
> *see also Samaritan Health Serv. v. Sullivan*, 1990 WL 33141 at *3
> (9th Cir. 1990) (unpublished table decision) ("We have held that if
> the Secretary's classification of a hospital effectively fixes the
> hospital's reimbursement rate, then that decision is a 'final
> determination' as referred to 42 U.S.C. § 1395oo(a)(1)(A)(ii).").[62]

Accordingly, the Court upheld the Board's decision to dismiss because the DSH SSI fraction was
only one of the variables that determine whether a hospital receives a DSH payment (and, if so,
for how much) and the publication of a hospital's SSI fraction is not a determination as to the
amount of payment received.[63]

This is what makes these cases distinguishable from the facts presented in the D.C. Circuit's
decisions in *Washington Hospital* where the determination that was appealed finalized the only
hospital-specific variable used in setting the per-patient payment amount.  Specifically, the
hospitals in *Washington Hospital* appealed their "Final Notice of Base Period Cost and Target
Amount Per Discharge" and the D.C. Circuit found:  (a) "the *only* *variable factor* in the final
determination as to the amount of payment under § 1395ww(d) is the hospital's target amount . .
. .";[64] and (b) "The amount is the per-patient amount calculated under § 1395ww(d) and is final
once the Secretary has published the DRG amounts (as has) and finally determined the hospital's
target amount.  Here each of the hospitals has received a 'Final Notice of Base Period Cost and
Target Amount per Discharge.'  The statute requires no more to trigger the hospital's right to
appeal PPS Payments to the PRRB."[65]

Similar to the D.C. District Court's decision in *Memorial Hospital*, while the policy at issue in
these cases was promulgated/finalized in the June 2023 Final Rule, it is *not* a "final determination"
as to the amount of payment received by Providers for their various fiscal years at issue.  Rather,
the June 2023 Final Rule reflects "just one of the variables that determines whether hospitals
receive a DSH payment [for the relevant fiscal year] *and*, *if so*, *for how much*"; and any "*final*
*payment* determination"[66] on whether a hospital receives a DSH payment for a particular fiscal
year and, if so, for how much *is made during the cost report audit/settlement process as explained
at 42 C.F.R. § 412.106(i)*.[67]  In this regard, the Board again notes that the June 2023 Final Rule did
not make a determination on any specific hospital's DSH eligibility and, if so, the amount of DSH
payment.  Rather, as it relates to this appeal, the Final Rule adopts a policy that is to be applied
*retroactively* but only to certain hospitals and makes clear that, *following the publication of new*

---

[62] *Id.* at *8.
[63] *Id.* at *9.
[64] 795 F.2d at 143 (emphasis added).
[65] *Id.* at 147 (footnote omitted).
[66] 42 C.F.R. § 412.106(i)(2) (emphasis added).
[67] 2022 WL 888190 at *9 (emphasis added).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 17

*SSI percentages*, those affected hospitals who had open cost reporting periods for this issue would be issued an NPR (original or revised) that both would apply the finalized policy and would determine: (a) DSH eligibility for a hospital's prior period that is still open for resolution (whether through issuance of an original or revised NPR); and (b) if so, the amount of the DSH payment.[68]

In summary, the Board finds that the June 2023 Final Rule appealed in the instant case is not an appealable "final determination" within the context of 42 U.S.C. § 1395oo(a)(1)(A)(ii) and 42 C.F.R. § 405.1835(a) and the appeal (as alleged) appears premature.[69] Accordingly, the Board finds it is appropriate dismiss the instant appeal and remove it from the Board's docket, since satisfying the criteria set out in 42 C.F.R. § 405.1835(a) is required (as explained in 42 C.F.R. §§ 405.1837(a)(1) and 405.1837(c)(1)) before the Board can exercise jurisdiction over an appeal,[70] and since the Providers have failed to demonstrate in its hearing request that those criteria have been met for the fiscal years under appeal.[71]

### B.   Even if the June 9, 2023 Final Rule Could Be Appealed as a "Final Determination" Under 42 U.S.C. § 1395oo(a)(1)(A)(ii), the Providers' Appeal Requests Failed to Meet the Minimum Content Requirements For an Appeal Request to Demonstrate that the Final Rule Was Applicable to Them For the Fiscal Years at Issue.

42 C.F.R. § 405.1835(c) specifies the content requirements for a request for a Board hearing as a group appeal.  The Providers allege that the issue in these appeals "is pending in an appeal that was remanded to the MAC."  Notwithstanding, they have not provided any explanation in their appeal requests of why the Board has jurisdiction over their appeal and *none has included **any** information on the other "pending . . . appeal that was remanded to the MAC" they allege in their appeal requests*.  In this regard, the Board notes that it is the Providers' responsibility under 42 C.F.R. § 405.1837(c) and Board Rules to include the necessary documentation in the appeal request to demonstrate the Board's jurisdiction over the appeals.

42 C.F.R. § 405.1837(a)(1) makes clear that a provider's right to a Board hearing as part of group appeal is dependent on "[t]he provider satisfy[ng] individually the requirements for a Board hearing under § 405.1835(a) or § 405.1835(c), except for the $10,000 amount in controversy requirement."  One of the requirements in § 405.1835(a) is that the provider is appealing "a final contractor or Secretary determination."

The content requirements for a group appeal request are located at 42 C.F.R. § 405.1837(c) and specify that the appeal request must "demonstrate[e] that the request satisfies the requirements for a Board hearing as a group appeal, as specified in paragraph (a) of this section" and that, in

---

[68] *See supra* note 59 (confirming that none of the Providers appealed from the publication of SSI fractions).
[69] The Board's dismissal does not mean that the Secretary's policy finalized in the June 2023 Final Rule cannot be appealed. As noted *supra* in the preamble to the June 2023 Final Rule, providers may appeal NPRs or revised NPRs that are subsequently issued and reflect this policy *as it relates to prior periods held open for this issue*. This may encompass the Providers depending on the nature and status of the alleged remand(s) referenced by the Providers and the issuance of revised NPRs as appropriate and consistent with the terms of that remand.
[70] 42 C.F.R. § 405.1840(a), (b).
[71] 42 C.F.R. § 405.1837(c).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 18

addition to the "final contractor or Secretary determination under appeal", must include "any other documentary evidence the providers consider to satisfy the hearing request requirements of paragraphs (c)(1) . . . of this section."

Here, none of the Providers include as part of their appeal requests any documentation relating to the implied *prior* appeals and related remand, notwithstanding: (1) their responsibilities under 42 C.F.R. § 405.1837(c) as quoted above, and (2) the fact that Board Rule 35.3 specifies that evidence must be submitted into the record by a party including evidence from another Board case:

> The Board will **not** be responsible for supplementing any record with evidence *from a previous hearing*. All evidence submitted into the record, **must** be done by the parties.[72]

Without having the NPR or any additional documentation on the Providers' alleged remand as it relates to the fiscal years at issue, the Board cannot confirm that the June 2023 Final Rule is, in fact, applicable to the Provider's for the fiscal years at issue (*i.e.*, that the fiscal years appealed by the Providers remain open and are eligible for resolution of the Part C days issue raised in the this appeal through the operation of the June 2023 Final Rule).  Indeed, if the Providers' alleged remand(s) for the fiscal years at issue is still pending before MAC, then the Remand Order itself (whether from a Court, the Administrator, or the Board) is relevant since it might otherwise preclude Board consideration of these appeals.[73]  In this regard, the Board is unable determine whether each of the Providers even qualified for a DSH payment during the fiscal years at issue since the record does not include a copy of the relevant NPR/revised NPR with the relevant audit adjustment pages alleged to have been issued to the Providers for the relevant fiscal years.  Accordingly, the Board finds that the Providers' appeal requests are *fatally* flawed because, even if the June 2023 Final Rule were an appealable "final determination" under 42 U.S.C. § 1395oo(a)(1)(A)(ii), it is unclear whether that Final Rule is, in fact, applicable *to the fiscal years appealed by the Provider* given their failure to comply with the content requirements of 42 C.F.R. § 405.1837(c) requiring its appeal request demonstrate that each of the Providers satisfies the requirements for Board hearing and that the "final determination" being appealed, *in fact*, involves a payment determination **retroactively** *applicable to them* under the terms of the Final Rule.  This finding serves as an alternative and *independent* basis for the Board's dismissal of these appeals.

### C. Multiple Participants Also Can Be Dismissed For Failure to File A Timely Appeal of the June 2023 Final Rule

QRS directly added the following participants more than 180 days after the publication of the June 2023 Final Rule, as follows, *in 3 different CIRP group cases involving 2010, 2011 and 2012*:

---

[72] (Emphasis added.)

[73] *See also* CMS Ruling 1739-R; Board Rule 4.6 (entitled "No Duplicate Filings" and specifying in Board Rule 4.6.2 that "Appeals of the same issue from distinct determinations covering the same time period must be pursued in a single appeal").

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 19

| Provider | Prov. No. | FY | Case No. |
|---|---|---|---|
| CHI St. Vincent Hosp. Hot Springs | 04-0026 | 2010 | 24-0416GC |
| | | 2011 | 24-0418GC |
| Mercy Hospital Fort Smith | 04-0062 | 2010 | 24-0416GC |
| | | 2011 | 24-0418GC |
| | | 2012 | 24-0420GC |

Specifically, QRS directly added each of these participants on February 6, 2024 which is 242 days after the June 2023 Final Rule was published.  62  The Board finds that the direct-add requests (*i.e.*, appeal requests) for the above-5 participants were ***not*** timely filed as required by the Board's enabling statute at 42 U.S.C. § 1395oo(a)(3), which specifies that appeals of Federal Register Notices (*i.e.*, appeals under 42 U.S.C. § 1395(a)(1)(ii)) must be filed "*within . . . 180 days after **notice** of the Secretary's final determination.*"[74]  The direct-add requests were filed in OH CDMS approximately ***2 months past*** the filing deadline of 180 days after the issuance of the June 2023 Final Rule.

Consistent with 42 U.S.C. § 1395oo(a)(3), 42 C.F.R. § 405.1835(a)(3) specifies that a provider's appeal request must be filed no later than 180 days after the "date of receipt" of the final determination being appealed:

> (3) Unless the provider qualifies for a good cause extension under § 405.1836, the date of receipt by the Board of the provider's hearing request must be no later than 180 days after the date of receipt by the provider of the final contractor or Secretary determination.

The regulation at 42 C.F.R. § 405.1837(a)(1) makes clear that this requirement applies to provider's participating in a group appeal whether by transfer or direct add.[75]  To this end, Board Rule 7.1.1 specifies that the appeal request must "[i]dentify the date the final determination ***was issued***"[76] and Board Rule 4.3.2 specifies in connection with appeals based on a Federal Register Notice that:  (1) "[t]he date of receipt of a Federal Register Notice is the date the Federal Register is published"; and (2) "[t]he appeal period begins on the date of publication and ends 180 days from that date."

The Board is bound by all of the provisions of Title XVIII of the Act (the Social Security Act, as amended) and the regulations issued thereunder.[77]  The Board cannot apply a regulation or

---

[74] (Emphasis added.)
[75] 42 C.F.R. § 405.1837(a)(1) specifies that a provider's right to participate in a group is dependent, in part, on the "[t]he provider satisfy[ying] individually the requirements for a Board hearing under § 405.1835(a) or § 405.1835(c), except for the $10,000 amount in controversy requirement in § 405.1835(a)(2) or § 405.1835(c)(3)."  NOTE – none of the providers in these 149 appeals have alleged that they are appealing from the nonissuance of an NPR or revised NPR consistent with § 405.1835(c) and, to that end, there is no information in the records for these cases to support such an allegation consistent with Board Rule 7.5.
[76] (Emphasis added.)
[77] *See* 42 C.F.R. § 405.1867.

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 20

instruction which is contrary to a statute and other regulations that deal specifically with the matter at hand: the date a provider is deemed to have notice of the contents of the Federal Register.  In this case, the laws and regulations governing the publication of Federal Register notices specifically define the time of notice as that of publication.  These laws and regulations have been incorporated into Title XVIII.

The Secretary[78] has enacted Part 401 of Title 42 of the Code of Federal Regulations which is entitled "General Administrative Requirements."  Subpart B, §§ 401.101(a)(1) and (2) of this Part states that "[t]he regulations in this subpart: (1) Implement section 1106(a)[79] of the Social Security Act [relating to disclosure of information] as it applies to [CMS] . . . [and] (2) Relate to the availability to the public, under 5 U.S.C. § 552,[80] of records of CMS."  These laws and regulations set out which records are available and how they may be obtained, and they supplement the regulations of CMS relating to the availability of information.  Section 401.106 of this subpart, which deals with publication of materials under 5 U.S.C. § 552, requires publication to serve as notice and identifies the Federal Register as the vehicle to be used to give notice.  Section 552(a) states in part that:

> (1)  Each agency shall separately state and currently publish in the Federal Register for the guidance of the public-
>
> * * * *
>
> (D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and
> (E) each amendment, revision, or repeal of the foregoing.

In order to comply with the statutes and regulations requiring that public notice be given, the Secretary annually publishes the schedules of the Inpatient Prospective Payment System ("IPPS") rates as well as other IPPS policies in the Federal Register pursuant to the requirements of 42 C.F.R. § 412.8(b)(2).  The Secretary may issue other changes as Federal Register Notices outside of this annual ratesetting process as was done here with the issuance of the Part C days policy published in the June 9, 2023 Final Rule.  These processes were created to comply with 5 U.S.C. § 552 of the Freedom of Information Act which requires that agencies publish regulations and notices in the Federal Register.[81]

With regard to the Notices published in the Federal Register, 44 U.S.C. § 1507 states in part that:

---

[78] of the Department of Health and Human Services.
[79] 42 U.S.C. § 1306(a).
[80] 5 U.S.C. § 550 *et seq.* contains the Administrative Procedures Act; 5 U.S.C. § 552 deals with the availability of government information and is known as the Freedom of Information Act ("FOIA").
[81] *See also* 42 C.F.R. Part 401, Subpart B.

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 21

> A document required. . .to be published in the Federal Register is not
> valid as against a person who has not had actual knowledge of it until
> the duplicate originals or certified copies of the document have been
> filed with the Office of the Federal Register and a copy made
> available for public inspection as provided by section 1503. . . .
> *[F]iling of a document, required or authorized to be published [in the
> Federal Register] by section 1505. . .is sufficient to give notice* of the
> contents of the document to a person subject to or affected by it.[82]

Reflecting new technology and the ability to transmit information immediately upon publication, the
Government Printing Office ("GPO") promulgated 1 C.F.R. § 5.10 which authorizes publication of
the Federal Register on the internet at the GPO website.[83] The GPO website containing the Federal
Register is updated daily at 6 a.m. Monday through Friday, except holidays.[84] Consequently, a
provider is deemed to have notice of the Part C days policy at issue on the date the Federal Register
was published and made available online.   Indeed, the Board notes that Notices are often available
for public inspection several days **prior to** the official publication date and, here, the June 9, 2023
Final Rule was posted to the public at 4:15 pm on June 7, 2023, 2 days in advance of the June, 9,
2023 publication date.[85]

With respect to statutes and regulations dealing with the Federal Register, the Supreme Court has
found that:

> Congress has provided that the appearance of rules and regulations
> in the Federal Register give legal notice of their contents . . . .
>
> . . . Regulations [are] binding on all who sought to come within the
> [Act], regardless of actual knowledge of what is in the Regulations
> or of the hardship resulting from innocent ignorance.[86]

The statutes governing the Board (44 U.S.C. § 1507 as applied through the requirements of 42
C.F.R. § 401.101 and the Administrative Procedures Act ("APA")) are clear on their face: ***the date
of publication*** of the Federal Register is the date the Providers are deemed to have notice of the
June 9, 2023 Final Rule.  The Board is bound by all of the provisions of Title XVIII which
includes, by reference, the provisions of the Administrative Procedures Act and the Public Printing
and Documents law which require that CMS publish its notices and regulations in the Federal
Register.  In publishing materials in the Federal Register, CMS must comply with the statutes and
regulations governing the Superintendent of Documents and the Governing Printing Office.

---

[82] (Emphasis added).
[83] *See also* 44 U.S.C. § 4101 (the Superintendent of Documents is to maintain an electronic director and system of
online access to the Federal Register).
[84] *See* http://www.gpo.gov/help/index.html#about_federal_register.htm.
[85] https://www.federalregister.gov/public-inspection/2023/06/07 (last accessed Jan. 19, 2024).
[86] *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 22

Pursuant 42 U.S.C. § 1395oo(a)(3), the Board's enabling statute, providers have 180 days "after *notice* of the Secretary's final determination" to file an appeal.  To this end, Board Rule 4.3.2 confirms that the appeal period for a final rule published in the Federal Register appeal ends 180 days from the date of ***publication***, not the effective date that may be listed in a provision:

> The date of receipt of a Federal Register Notice is the date the
> Federal Register is ***published***. The appeal period begins on the date
> of publication and ends 180 days from that date.[87]

In this case, the notice of the Secretary's determination is, by law, the date the Federal Register is issued by the Superintendent of Documents, or June 9, 2023.  Here, the 180th day for appealing was ***Wednesday, December 6, 2023***.  The above-listed 5 direct-add requests were not filed with the Board until ***more than 2 months after this deadline*** (specifically February 6, 2024 and, thus, were not timely filed.[88]

Based on the above findings, the Board concludes that the direct-add requests of CHI St. Vincent Hosp. Hot Springs (Prov. No. 04-0026) to be added to Case Nos. 24-0416GC and 24-0418GC and the direct-add requests of Mercy Hospital Fort Smith (Prov. No. 04-0062) to added to Case Nos. 24-0416GC, 24-0418GC, and 24-0420GC failed to meet the claims-filing requirements for a Board hearing request[89] due to the failure of the Providers' to *timely* file their direct-add request to these groups to appeal the June 9, 2023 Final Rule by the Wednesday, December 6, 2023 filing deadline consistent with 42 U.S.C. § 1395oo(a)(3), 42 C.F.R. §§ 405.1835(a)(3) and 405.1837(a)(1) and Board Rules 4.3.2 and 7.1.1 and, as such, the Board hereby dismisses them. This is a separate and independent basis to dismiss these 5 participants.

### D. Conclusion

The Board finds that: (1) the Part C policy issued in the June 2023 Final Rule that the Providers appealed for the fiscal years at issue is not an appealable "final determination" within the context of 42 U.S.C. § 1395oo(a)(1)(A)(ii) and 42 C.F.R. § 405.1835(a); and (2) even if the June 2023

---

[87] Emphasis added.

[88] The Providers in these 149 appeals have not requested good cause exception under 42 C.F.R. § 405.1836 and have not presented any evidence suggesting that they would qualify under the criteria specified in that regulation.

[89] *See* 42 C.F.R. § 405.1840(a), (b). The Board notes that 42 C.F.R. § 405.1840 is entitled "Board Jurisdiction" but it also addresses certain claims-filing requirements such as timelines or filing deadlines. Whether an appeal request is timely filed with the Board is not a jurisdictional requirement per se, but rather it is a claims-filing requirement as the Supreme Court made clear in *Sebelius v. Auburn Reg. Med. Ctr.*, 568 U.S. 145 (2013) ("*Auburn*").  Unfortunately, following the issuance of *Auburn*, the Secretary has not yet updated § 405.1840 to reflect the clarification made by the Supreme Court in *Auburn* that distinguishes between the claims-filing requirements for a Board hearing request versus jurisdictional requirements for a Board hearing.  *See also* Board Rule 4.1 ("The Board will dismiss appeals that fail *to meet the timely filing requirements **and/or** jurisdictional requirements*."); 42 C.F.R. § 405.1835(b) (addressing certain other claims-filing requirements).

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 23


Final Rule could be appealable as a "final determination" under 42 U.S.C. § 1395oo(a)(1)(A)(ii), the Providers' appeal request failed to meet the content requirements under 42 C.F.R. § 405.1837(c) based on its failure to demonstrate that the June 2023 Final Rule was, in fact, a payment determination *retroactively* applicable to them for the fiscal years at issue consistent with the terms of that Final Rule.  Further, the Board also as a separate and independent rational dismisses several participants, as set forth above, from Case Nos. 24-0416GC, 24-0418GC, and 24-0420GC because they failed to meet the claims-filing requirements for a Board hearing request due to their failure to *timely* file their direct-add request to join the relevant group.  Based on the foregoing, the Board hereby dismisses the 13 QRS appeals listed in **<u>Appendix A</u>** *in their entirety* and removes them from the Board's docket.

Review of this determination may be available under the provisions of 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877.


<u>Board Members Participating</u>:                     For the Board:

Clayton J. Nix, Esq.                                                                3/7/2024
Robert A. Evarts, Esq.
Kevin D. Smith, CPA
Ratina Kelly, CPA                     X  Clayton J. Nix
                                      _____
                                      Clayton J. Nix, Esq.
                                      Chair
                                      Signed by: PIV


Enclosure:  Appendix A – Listing of 13 QRS CIRP Groups and Individual Provider Cases


cc:     Michael Redmond, Novitas Solutions, Inc. (J-H)
        Byron Lamprecht, WPS Government Health Administrators (J-5)
        John Bloom, Noridian Healthcare Solutions, c/o CGS Administrators (J-F)
        Jacqueline Vaughn, Office of the Attorney Advisor
        Wilson Leong, FSS

Notice of Dismissal for Case Nos. 24-0416GC *et al.*
QRS Treatment of Part C Days Final Rule Groups
Page 24

**APPENDIX A**
**Listing of 13 QRS CIRP Group and Individual Cases**

| | |
|---|---|
| 24-0416GC | Mercy Health System CY 2010 Treatment of Part C Days Final Rule CIRP Group |
| 24-0418GC | Mercy Health System CY 2011 Treatment of Part C Days Final Rule CIRP Group |
| 24-0420GC | Mercy Health System CY 2012 Treatment of Part C Days Final Rule CIRP Group |
| 24-0421GC | Mercy Health System CY 2014 Treatment of Part C Days Final Rule CIRP Group |
| 24-0424 | Skagit Valley Hospital (50-0003), FFY 2007 |
| 24-0427 | Skagit Valley Hospital (50-0003), FFY 2008 |
| 24-0429 | Skagit Valley Hospital (50-0003), FFY 2009 |
| 24-0430 | Skagit Valley Hospital (50-0003), FFY 2010 |
| 24-0431 | Skagit Valley Hospital (50-0003), FFY 2011 |
| 24-0433 | Skagit Valley Hospital (50-0003), FFY 2012 |
| 24-0434 | Skagit Valley Hospital (50-0003), FFY 2013 |
| 24-0436 | Mercy Hospital Washington (26-0052), FFY 2013 |
| 24-0437 | Mercy Hospital Lebanon (26-0059), FFY 2009 |